MAXWELL, J.,
for the Court:
¶ 1. Tammala Ravenstein (Tammy) was listed as the joint owner with her then-husband, Ronald Ravenstein (Ronnie), on four certificates of deposit (CDs). Under the identical terms of each CD, only one endorsement was necessary for a person who had signed the signature card to request a “transfer,” which the CDs defined as a change in ownership. Ronnie, who had signed the signature card, without Tammy’s knowledge, transferred the four CDs to his sole ownership. Ronnie then pledged the CDs as collateral for a loan from the bank that he defaulted on, triggering the bank’s right to apply the CDs against the balance of the loan.
¶2. Aggrieved by the loss of the CDs, Tammy has not sued Ronnie. Instead, she has sued the bank for allowing the transfer. She claims the bank breached her contractual rights. But the unambiguous terms of the CDs permitted the bank to consent to a transfer requested by one person who had signed the signature card, without obtaining the other owner’s consent. And contrary to Tammy’s assertion, under the clear terms of the CDs, the bank was under no obligation to Tammy to require Ronnie surrender the certificates, which were in Tammy’s possession, or notify Tammy of Ronnie’s request, before consenting to the transfer.
¶ 3. Because the bank did not breach the terms of the CDs or violate Tammy’s ownership rights in the CDs, we affirm the circuit court’s judgment granting summary judgment in favor of the bank on all of Tammy’s claims, which included breach of contract and conversion.
Background
¶ 4. In February and March 2006, Ronnie opened four CDs with Madison County Bank (the Bank).[1] For three of the CDs, each in the amount of $100,000, both Ronnie and Tammy were listed as joint owners with the right of survivorship. For the fourth, in the amount of $50,000, Ronnie, Tammy, and their daughter, Reagan, were listed as joint owners with the right of survivorship.
¶5. With the exceptions of ownership rights, the amounts in the CDs, and the maturity dates,[2] all four CDs had identical provisions. Under the “Primary Agreement” section:
You [ (defined as “the depositor”) ] agree to keep your funds with us [ (the issuer of the account) ] until the maturity date.... You may not transfer this account without first obtaining our written consent. You must present this certificate when you request a withdrawal or a transfer.
The CDs defined “transfer” as “any change in ownership, withdrawal rights, or survivorship rights, including (but not limited to) any pledge or assignment of this account as collateral.” Under the “Withdrawals and Transfers” section:
Only those of you who sign the permanent signature card may withdraw funds from this account.... The specific number of you who must agree to any withdrawal is written on page one in the section bearing the title “Number of Endorsements.” This means, for example, that if two of you sign the signature card but only one endorsement is necessary for withdrawal then either of you may *400 request withdrawal of the entire account at any time.
These same rules apply to define the names and the number of you who can request our consent to transfer.
On page one of each CD the “number of endorsements needed for withdrawal or any other purpose” was “1.” And only one person signed the signature card — Ronnie.
¶ 6. In April 2006, Ronnie requested a transfer — that the ownership of all four CDs be changed so that he was the sole owner and either Tammy or his two daughters were pay-on-death beneficiaries. The Bank consented to the change of ownership, even though Ronnie had not presented the certificates, which Tammy attests were in her possession.
¶ 7. Four months later, Ronnie obtained a $450,000 loan from the Bank for working capital for a car dealership in North Carolina that Ronnie had purchased. Ronnie pledged his interest in the four CDs as collateral for the loan. Both the CDs and the loan agreement gave the Bank the right to set off any indebtedness owed to the Bank with money in any deposit account for which Ronnie had the right of withdrawal. So when Ronnie defaulted on the loan in May 2007, the Bank exercised its right to set off and applied the money in the CDs to the loan’s balance.
¶ 8. In February 2010, Tammy, who is now divorced from Ronnie, sued the Bank and its holding company, Madison Financial Corporation, on her and Reagan’s behalf. She alleged the Bank, by not requiring Ronnie to present the certificates when he changed ownership and by not notifying her about the change in ownership, was responsible to Tammy and Reagan for the loss of the money in the CDs. The circuit court granted the Bank and Madison Financial Corporation summary judgment on all of Tammy’s claims. Tammy timely appealed.
Discussion
¶ 9. On appeal, we consider de novo whether the Bank was entitled to summary judgment in its favor. See Lewallen v. Slawson, 822 So.2d 236, 237 (¶ 6) (Miss.2002). Under Mississippi Rule of Civil Procedure 56(c), summary judgment should be granted “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Here, there are no material facts in dispute. So the issue is whether the circuit court rightly found the Bank was entitled to a judgment as a matter of law.
¶ 10. “Summary judgment must be granted when the nonmoving party”— in this case, Tammy — “‘fails to make a showing sufficient to establish the existence of an element essential to [her] case and on which [she] bears the burden of proof at trial.’ ” Kitchens v. Dirtworks, Inc., 50 So.3d 388, 389 (¶ 4) (Miss.Ct.App. 2010) (emphasis added) (quoting Borne v. Dunlop Tire Corp., 12 So.3d 565, 570 (¶ 16) (Miss.Ct.App.2009)). Looking at the three claims that Tammy argues should have survived summary judgment, we agree with the circuit court that Tammy failed to make a sufficient showing to establish triable claims for breach of contract, breach of the duty of good faith and fair dealing, and conversion.[3]
*401 I. Breach of Contract
¶ 11. To prove breach of contract, Tammy had the burden to prove (1) the existence of a valid and binding contract and (2) the Bank’s breach. Bus. Commc’ns, Inc. v. Banks, 90 So.3d 1221, 1224-25 (¶¶ 10-11) (Miss.2012) (overruling Warwick v. Matheney, 603 So.2d 330, 336 (Miss.1992)). While the four CDs formed contracts, giving Tammy and Reagan certain contractual rights, none of those rights were violated by the Bank when— without requiring Ronnie present the CDs and without giving Tammy notice — it consented to Ronnie’s request for a transfer.

A. Existence of Contracts

¶ 12. The four CDs were non-negotiable. This means that they were not instruments governed by Article 3 of Mississippi’s Uniform Commercial Code. Miss. Code Ann. § 75-3-102 (Rev.2002); see Estate of Isaacson v. Isaacson, 508 So.2d 1131, 1134 (Miss.1987) (holding CDs that preclude transfer, by stating they are “not transferable,” “not negotiable,” or “nonnegotiable,” are not subject to Article 3). Instead, the terms and provisions of the CDs created contracts, governed by contract law. See Epperson v. SOUTHBank, 93 So.3d 10, 16 (¶ 15) (Miss.2012) (citations omitted). Neither Tammy nor the Bank dispute that each CD created a contract and that contract law controls. See id.
¶ 13. The Bank does, however, dispute Tammy and Reagan were parties to the contracts, based on the fact they did not sign the signature cards. The fact that Tammy and Reagan did not sign the signature card did affect their rights under the contract. Significantly, it meant they, in contrast to Ronnie, could not request a withdrawal or a transfer. But we do not find it kept either from being a party to the contract.[4] Under this court’s precedent, a CD in which “[t]he ownership stated on the face of the certificate is that of joint tenancy” is a contract between the bank and joint owners. Thornhill v. Chapman, 748 So.2d 819, 823 (¶ 13) (Miss.Ct.App.1999). Page one of all four CDs listed Tammy as a joint owner (and Reagan as an additional joint owner on the fourth CD). Thus, Tammy and Reagan were parties to the respective contracts created by the CDs. See id.

B. Breach

¶ 14. While we reject the argument that Tammy and Reagan, as non-signatories, had no rights under the contract, we affirm summary judgment because Tammy has failed to show the Bank violated any of those rights.
¶ 15. For the second element of her claim, Tammy had to show the Bank “breached” the terms of the CDs. See Bus. Commc’ns, Inc., 90 So.3d at 1224-25 (¶¶ 10-11). A “breach of contract” is a “[vjiolation of a contractual obligation by failing to perform one’s own promise, by repudiating it, or by interfering with another party’s performance.” Black’s Law Dictionary 200 (8th ed.2004). Here, Tammy claims the Bank breached the terms of the CDs because (1) it did not require Ronnie to present the certificates; and (2) it did not notify her of the changes in ownership of the CDs.
¶ 16. Factually, both of these statements are true — Ronnie did not present the CDs, and the Bank gave no notification to Tammy of the change. But legally, these actions were not breaches by the Bank because neither was a failure of the Bank to perform a promise it made to Tammy under the terms of the CDs. Con *402 trary to Tammy’s assertion, the Bank did not promise Tammy that it would require Ronnie to surrender the certificates or notify her before allowing a transfer.
■ 1. Presentment
¶ 17. Tammy acknowledges that, under the terms of the CDs, only one signature was necessary to request a change in ownership of the CDs, without any other owner’s agreement. She also acknowledges that Ronnie, who had signed the signature card, was the only person at the time who could have requested a transfer and was in fact the person who did request the transfer. So she is not arguing the Bank breached the terms of the CDs by consenting to a transfer by someone other than the person authorized to request a transfer or without the necessary number of endorsements.
¶ 18. Instead, she is arguing the Bank breached the provision of the CDs in which the Bank required the person requesting a transfer to “present the certificate” at the time of the request. She claims this provision obligated the Bank to require presentment in order to protect her as joint owner. She further claims she relied on this provision to her detriment, believing that, so long as she retained possession of the certificates, Ronnie could not exercise his right of withdrawal or transfer.
¶ 19. But we find neither the language of the provision requiring presentment nor the terms of the CDs as a whole support Tammy’s contention. See Epperson, 93 So.3d at 16 (¶ 17) (holding that, when a contract is unambiguous, the court will enforce the plain meaning of the contract as the intention of the parties).
¶ 20. Page two of the CDs begins with defining “we” and “you,” the terms used throughout the CDs to identify the parties. “We” and “us” refers to the “issuer of the account.” And “you” refers to “the deposi-tóos).” The provision Tammy relies on does not state that “we” — i.e., the Bank— “must.” Instead, it states that “you” — i.e., the depositor — “must.” It provides: “You must present this certificate when you request a withdrawal or a transfer.” (Emphasis added). So this provision imposes an obligation on the depositors to present the certificates. It does not impose an obligation on the Bank to require the certificates be presented.
¶ 21. The obligation to present the certificates to the Bank was for the Bank’s protection, as part of its right to restrict early withdrawals. See Epperson, 93 So.3d at 19 (¶ 27) (discussing presentment as a right owed to the Bank, not an obligation the Bank owes to joint depositors). This provision gave the Bank the right to refuse to consent to Ronnie’s request for transfer because he did not present the certificates. See id. But it did not obligate the Bánk to require presentment. See 13 Williston on Contracts § 39:17 (4th ed.2000) (noting a party may voluntarily waive a contractual condition that has been inserted for his benefit). “[I]t is simple contract law that a party may waive the protections of any provision of a contract.” Sanderson Farms, Inc. v. Gatlin, 848 So.2d 828, 837 (¶ 23) (Miss.2003); see also 13 Williston on Contracts § 39:14 (discussing “the general principle of contract law that either party to a contract may waive virtually any contractual provision or right in his or her favor”). Thus, by not requiring presentment, the Bank was waiving a contractual protection, not breaching a contractual obligation.
¶ 22. Further, by looking at all the terms of the CDs, it is clear that the way for a joint owner like Tammy to protect against withdrawal or transfer without her consent was to be on the signature card and be among the number of required endorsements — and not to merely possess *403 the CDs. Had Tammy been on the signature card and had the CDs required two endorsements for a transfer, the Bank’s consent to Ronnie’s request for a transfer would have been a breach. But Tammy concedes that only one signature was required and Ronnie was authorized to give his signature. Assured that Ronnie was authorized to make the transfers without Tammy’s agreement, the Bank could waive the presentment requirement and consent to the transfers without breaching any contractual obligation to Tammy. See 13 Williston on Contracts § 39:24 (“[I]t is well settled that a contracting party may unilaterally waive a provision of the contract, including ... any condition precedent, which has been placed in the contract for his or her benefit.”).

2. Notice

¶ 23. Tammy next argues that the Bank breached the terms of the CDs because it did not notify her that the Bank was “changing the terms” of the CDs. To support her argument, Tammy relies on language in the “Primary Agreement” section:
We may change any term of this agreement. Rules governing changes in interest rates have been provided on page 1. For other changes we will give you reasonable notice in writing or by any other method permitted by law.
Tammy argues that, by consenting to Ronnie’s request in April 2006, the Bank “changed the terms” of the CDs without giving her reasonable notice. Had she been given notice, she claims she could have stopped the changes from occurring.
¶ 24. But what happened in April 2006 was not a change in the terms of the CDs. It was a change in ownership, which the CDs clearly define as a “transfer.” And the CDs do not require the Bank to notify joint owners of a request for a transfer made by someone who signed the signature card, as long as the necessary number of endorsements were met. Because under the clear terms of the CDs, only one endorsement was required, the Bank was under no obligation to notify Tammy in these circumstances. Thus, the lack of notice does not support her claim for breach of contract.
¶ 25. We agree with the circuit court that Tammy’s breach-of-contract claim fails as a matter of law.
II. Breach of the Duty of Good Faith and Fair Dealing
¶ 26. Related to Tammy’s breach-of-contract claim was her claim that the Bank, by waiving presentment and not notifying her, breached its duty of good faith and fair dealing.
¶27. “All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement.” Limbert v. Miss. Univ. for Women Alumnae Ass’n, 998 So.2d 993, 998 (¶ 11) (Miss.2008) (citing Morris v. Macione, 546 So.2d 969, 971 (Miss.1989)). Good faith means “the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party.” Cenac v. Murry, 609 So.2d 1257, 1272 (Miss.1992). In contrast, bad faith requires “a showing of more than bad judgment or negligence; rather, ‘bad faith’ implies some conscious wrongdoing ‘because of dishonest purpose or moral obliquity.’” Univ. of S. Miss. v. Williams, 891 So.2d 160, 170-71 (¶ 24) (Miss.2004) (quoting Bailey v. Bailey, 724 So.2d 335, 338 (¶ 9) (Miss.1998)). However, a party does not breach the “implied covenant of good faith and fair dealing when the party ‘took only those actions which were duly authorized by the contract.’ ” Limbert, 998 So.2d at 999 (¶ 14) (quoting Gen. Motors Accep *404 tance Corp. v. Baymon, 732 So.2d 262, 269 (¶ 29) (Miss.1999)).
¶28. As discussed in the previous section, the unambiguous terms of the CDs clearly authorized the Bank to consent to a transfer requested by one person who was on the signature card. So the Bank was not acting in bad faith when it consented to Ronnie’s request. Further, by waiving the presentment requirement and not notifying Tammy, the Bank was not being dishonest or immoral towards Tammy but instead was merely exercising its own judgment regarding its contractual right to restrict withdrawal.
¶ 29. We agree with the circuit court that Tammy’s bad-faith claim also fails as a matter of law.
III. Conversion
¶ 30. Finally, Tammy argues she made a sufficient claim for conversion. “To establish the tort of conversion, ‘there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner’s right, or of an unauthorized and injurious use, or of a wrongful detention after demand.’” Stevens v. Smith, 71 So.3d 1230, 1233 (¶ 9) (Miss.Ct.App.2011) (quoting Cnty. Bank, Ellisville, Miss. v. Courtney, 884 So.2d 767, 772-73 (¶10) (Miss.2004)). Here, Tammy fails to show how the Bank wrongfully possessed the funds in the CDs or exercised dominion over the funds in exclusion or defiance of her rights.
¶ 31. The terms of the CD permitted change in ownership based on one person’s request, so long as he had signed the signature card. By permitting Ronnie to transfer the CDs, the Bank was not exercising dominion over the funds in the CDs in a way that defied Tammy’s rights.
¶ 32. Further, included in the terms of the CDs was the Bank’s right to set off:
You each agree that we may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt owed to us now or in the future, by any of you having the right of withdrawal, to the extent of such person’s or legal entity’s right to withdraw.
The CDs gave Ronnie the right to withdraw all the funds of the CDs. Thus, the CDs also gave the Bank the right to set off all the funds in the CDs against Ronnie’s debt, which was $100,000 greater than the collective amount of the CDs. As a “you” for purposes of the CDs, Tammy cannot deny that she agreed to the Bank’s right to set off. Thus, she cannot claim that the Bank, having exercised the right to set off, somehow converted her jointly owned funds when it applied the funds to Ronnie’s defaulted loan. Any claim she may have had for conversion would have been against Ronnie, not the Bank. See Stevens, 71 So.3d at 1237 (¶ 23) (affirming the grant of summary judgment in favor of two joint owners of a CD against a third joint owner for converting the CD’s funds, which he withdrew).
¶ 33. We agree with the circuit court that Tammy’s conversion claim against the Bank also fails as a matter of law.[5]
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
*405 LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.

. Madison County Bank is now known as Community Trust Bank.

. Two of the CDs were opened on February 3, 2006, and had a maturity date of February 3, 2007. The other two CDs were opened on March 8, 2006, and had a maturity date of March 8, 2007.

. In her complaint, Tammy had brought thirteen claims against the Bank, ranging from violations of the Uniform Commercial Code to negligence and fraud. But by only raising and arguing three of those claims on appeal, Tammy abandoned the other ten claims. See M.R.A.P. 28(a)(3), (6); Shavers v. Shavers, 982 So.2d 397, 401 (¶ 21) (Miss.2008).

. For example, the Bank cannot argue Tammy could not have enforced her rights of survivorship, had Ronnie died, because she did not sign the CDs.

. Because we find summary judgment was proper based on the merits, we need not address the Bank's alternative argument that the claims Tammy brought on her behalf were untimely based on the running of the three-year statute of limitations.